STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, SS.                                    Docket No. AP-02-12

                                                  JLH - PEN- 3/26/2003

Widewaters Stillwater Co., LLC,
        Appellant


                        v.

                                                  **ORDER ON APPEAL**

City of Bangor,
        Appellee

DONALD L. GARBRECHT
LAW LIBRARY

MAR 31 2003

        and

FILED & ENTERED
SUPERIOR COURT

MAR 26 2003

PENOBSCOT COUNTY

BACORD,
        Intervenor


        Widewaters Stillwater Co., LLC, (Widewaters) appeals from a decision of the

Bangor Planning Board denying its application for a site plan development permit under

the City's Land Development Code. The parties and the intervenor have filed written

argument, which the court has considered in conjunction with the record on appeal.

        Much of the procedural backdrop of this case is discussed in the court's order

issued in May 2001. That order is incorporated into this decision. For present purposes,

a limited review of the proceedings in this matter may be helpful. Widewaters filed the

application for a site development permit and two conditional use permits in early 2001.

These permit applications are associated with Widewaters' plans to develop a parcel of

land located on Stillwater Avenue in Bangor and construct a Wal-Mart superstore. A

public hearing on the applications was held in March and April 2001. Following

deliberations, the Board members voted 3-2 to deny Widewaters' site development

application. The Board unanimously approved the application for the conditional use

permits. Widewaters appealed the denial of the site development application. *See*

*Widewaters Stillwater Co., LLC v. City of Bangor*, AP-01-16 (Superior Court, Penobscot

County). This court construed the administrative record to reveal that the Board's

1

decision was based on CITY OF BANGOR, MAINE LAND DEVELOPMENT CODE § 165-114(I), which obligates the Board to consider the "[e]ffect [of the land development project] on the scenic or natural beauty of the area or on historic sites of rare and irreplaceable natural areas. . . ." For the reasons set out in the order dated May 30, 2001, the court concluded that section 165-114(I) violated the constitutional principles developed in *Kosalka v. Town of Georgetown*, 2000 ME 106, 752 A.2d 183. On that basis, the court vacated the Board's decision to deny the permit application.

That decision was then appealed to the Supreme Judicial Court. Holding that the administrative record did not adequately reveal the Board's findings and the specific legislative basis for its decision denying Widewaters' application, the Court remanded the case to the Planning Board for further proceedings, namely, the issuance of findings of fact. *Widewaters Stillwater Co., LLC v. Bangor Area Citizens Organized for Responsible Development*, 2002 ME 27, ¶ 12, 790 A.2d 597, 601.[1] Pursuant to that mandate on remand, the Planning Board considered Widewaters' application at two meetings in May 2002. The evidentiary record was not reopened. Rather, in light of the limited purpose of the remand, the Board's action was limited to formulating a set of specific factual findings corresponding to the 11 separate factors that, under section 165-114, the Board is required to consider.

When the Board voted in 2001 to deny Widewaters' site development permit application, the majority consisted of Frederick Costlow, Robert Lingley and Robert Kreitzer. Richard Fournier (the Board's chair) and George Burgoyne voted to approve the permit application. Robert Guerette was a member who was present at the 2001 meetings but was designated as a non-voting member, possibly because only five members would be called to vote in any proceeding.[2] Even though Guerette did not vote on the application in 2001, he was permitted to express his views on the merits of the issues, presumably in an advisory capacity. *See* R. H-2 at 10-11. In 2002, when the

---

[1] The intervenor, BACORD, rather than the City of Bangor, was named as the responding party in caption of the Law Court opinion because the City did not participate in that appeal.

[2] The procedural rules or protocol governing Planning Board meetings do not appear to be included in the record on this appeal.

Board was instructed to issue findings following remand from the Law Court, neither Kreitzer nor Burgoyne was a Board member. Costlow, Lingley, Fournier and Guerette, however, were still members. In anticipation of the first of the two May 2002 meetings, Costlow or a member of the Board's staff contacted Kreitzer and reviewed at least one draft of proposed findings that were responsive to the Law Court's mandate. *See* R. I-7 at p. 4, I-8 at p. 3.[3] At the May 7 meeting, after some preliminary discussion of the matter, the Board voted to postpone consideration of the proposed findings, which were presented in several alternative drafts, to allow more time for the Board members to study that material. Two weeks later, when the Board held another meeting, the Board unanimously approved several changes to one of the draft sets of findings they had considered. With that, the four members of the Board who also were members of the Board in 2001 and were present at the two 2001 hearings application in 2001 and who were also Board members in 2002 (namely, Fournier, Costlow, Lingley and Guerette) unanimously approved a set of findings of fact setting out the basis for the Board's action in 2001.[4]

As revealed in those findings, the Board's 2001 decision denying Widewaters' site development permit application was based on three of the eleven considerations set out in section 165-114, namely, sections 165-114(D), (I)[5] and (J). With respect to the last

---

[3] The minutes of the May 7 meeting reflect that Costlow contacted Kreitzer. However, the transcript of that meeting indicates that a member of the Board's staff did so.

[4] Thus, even the remaining Board member (Fournier) who voted in favor of the permit application in 2001 voted to approve the findings as a reflection of the basis for the majority vote denying that application. The fourth member who voted to accept the findings was Guerette, who was present as a non-voting member during the 2001 hearings. The vote to approve the findings in 2002 thus reflected the judgment of the 2001 voting members that the findings reflected the majority view and on a collateral determination that the findings also represented the views of the 2001 member who no longer served as a Board member in 2002.

It should also be noted that Harold Wheeler and David Clark were members of the Board as it was constituted in 2002 but were not members of the 2001 Board when it originally considered Widewaters' applications. They abstained from the 2002 vote of whether to approve the proposed findings of fact.

[5] Section 165-114(I) is the factor that this court found unconstitutional in the order that subsequently was vacated by the Law Court.

of these three provisions, section 165-114 requires the Board to "consider the following features and impacts before granting approval: . . . (J) Whenever situated, in whole or in part, within 250 feet of any pond, lake, river, stream or tidal waters, whether any project will not adversely affect the shoreline of such body or water." On this issue, the Board issued the following findings:

> Member Lingley and Kreitzer found that the outflow of the detention pond would have a negative impact on the stream at the project site. Additionally, a majority concludes that the shoreline would be affected as stated in paragraph I, above. To the extent that the shoreline provides nesting areas, it too would be affected as stated in paragraph I, above. Members Costlow and Lingley also find that the proposed detention pond is insufficient to address temperature, volume, and water quality issues which would affect the shoreline downstream. (See testimony of Dr. Andren.)

R. I-6 at p.7. As a result, the Board issued its findings dated May 7, 2002,[6] again denying Widewaters' application for site plan approval and approving its application for two conditional use permits. Widewaters has filed this appeal from that decision.

On this appeal, Widewaters argues that the Board's 2002 findings and decision are tainted by an ex parte communication, that the City and BACORD have waived their right to be heard in support of the Board's decision as it is presently framed, that the Board's findings are not supported by the evidence, and that the three sections on which the Board denied the application are unconstitutional. The court has considered the parties' written arguments on these issues.

### 1. Ex parte communications

In reviewing the administrative record, the Law Court concluded that the Board's findings were insufficient to the point where judicial review was "severely hamper[ed] . . . .The majority of the Board should have stated the basis of the denial of the permit and should have made factual findings underlying the decision." 2002 ME 27, ¶ 11, 790 A.2d at 600. To cure that problem, in its mandate the Court remanded the matter back to this

---

[6] The May 7 date is in error. The record makes clear that the findings were adopted as a result of the May 21 meeting. This discrepancy in dates would probably have significance only to the timeliness of Widewaters' appeal from that decision. That appeal was filed on June 20, which would be within 30 days of the date the findings in fact were issued. The appeal is therefore timely under rule 80B(b), which governs this case by virtue of section 165-11(F) of the City's ordinance.

court "with instructions [for this court] to remand to the Bangor Planning Board to issue findings of fact." Kreitzer was one of the members of the three-member majority of the Board as it was constituted in 2001. However, he was no longer a member of the Board when it received the case on remand. Accordingly, as a means to secure the basis for Kreitzer's vote on the application, he was contacted by a current Board member or by a member of the Board's staff. His conclusions, as expressed to that contact person, were then integrated into the findings of fact issued by the Board on remand. Kreitzer did not attend either of the May 2002 Board meetings where the nature of the Board's factual findings was addressed. Here, Widewaters argues that the contact with Kreitzer was improper. An allegation of an improper ex parte communication may be pursued as part on a rule 80B appeal either on the basis of the administrative record or through a trial of the facts. *Baker's Table, Inc. v. City of Portland*, 2000 ME 7, ¶ 9, 743 A.2d 237, 240-41.

In support of its argument, Widewaters relies on *Mutton Hill Estates v. Town of Oakland*, 468 A.2d 989 (Me. 1983). There, the Law Court found a conclusive violation of a permit applicant's rights to procedural due process when a municipal body prepared findings of fact with the participation of "admittedly biased opponents of the application" and where the applicant had not received notice of that process and was not afforded an opportunity to be heard. *Id.* at 992. This result would obtain if either the applicant's opponent presented evidence to the municipality in that ex parte process or, even without the presentation of such evidence, the opponents "unduly influenced members of the Board in making findings of fact unfavorable to the applicant's proposal." *Id.*

The circumstances of the Board's contact with Kreitzer here are fundamentally different from the improprieties discussed in *Mutton Hill*. Here, the Law Court instructed the Board to articulate the factual basis for its 2001 decision denying Widewaters' site development application permit. One of those decision-makers was no longer on the Board. Although there may have been other methods to obtain that former member's participation in the process that resulted in the findings of fact, one such approach was simply to seek his views through the informal process used here. That was accomplished by a Board member or by a member of the Board's staff. This is not considerably different than the process that was used with the other Board members, who, at a time other than during a Board meeting, reviewed the several draft sets of findings and

5

ultimately approved one of them. The record on this appeal, which is the manner in which Widewaters has elected to present this issue, does not suggest any improprieties in the contact with Kreitzer.

More importantly, the contact between the Board representative and Kreitzer does not implicate the substantive problems created by ex parte contact condemned in *Mutton Hill*. There, partisans met ex parte with the decision-makers. Here, Kreitzer met either with a staff member or with Costlow. This court previously rejected Widewaters' claim that Costlow was not impartial, and Widewaters does not advance any additional argument that Costlow was biased. Further, it has made no argument at all that the Board's staff was biased. Therefore, the contact between Kreitzer and the Board representative carries none of the taint that undermined the process in *Mutton Hill*. Accordingly, the court concludes that the portion of the findings attributed to Kreitzer are not the product of improper contact and that Widewaters' right to due process were not compromised by the manner of his participation.

**2. Waiver of argument**

Widewaters next contends that the City and BACORD are barred in this action from defending the Board's findings that its application did not satisfy the criteria set out in sections 165-114(D) and (J). This argument is premised on the nature of those parties' arguments in the appeal from the Board's 2001 decision denying Widewaters' site development permit application. Widewaters reasons that, during the first appeal in this matter, the arguments of the City and BACORD were limited to an analysis of section 165-114(I) and that in this proceedings those parties therefore have waived any argument defending the Board's reliance on subsections (D) and (J).

This argument, however, overlooks the essence of the Law Court's decision in the first appeal. In that first appeal, Widewaters, the City and BACORD all certainly proceeded on the premise that the Board's decision rested entirely on section 165-114(I). Indeed, the parties' arguments regarding the basis for the Board's decision did not go beyond that one provision. Further, this court construed the Board's findings in the same way, and the basis for the resulting opinion rested entirely on an examination of that isolated provision. However, the Law Court examined the same record and concluded that the record did not adequately reveal the basis for the Board's decision to deny

6

Widewaters' application. *Widewaters Stillwater Co.*, 2002 ME 27, ¶11, 790 A.2d at 600.[7] The Law Court specifically pointed out that the record did not clearly disclose whether (as the parties and this court had believed) the Board's decision was based on section 165-114(I). *Id.*, 790 A.2d at 600-01. If the Board's decision clearly rested on that one provision, then it would be appropriate to consider the constitutionality of that ordinance. *Id.*, 790 A.2d at 601. However, because the record did not foreclose the possibility that the Board denied Widewaters' application on the basis of some other provision of section 165-114, the Board would be required to provide that clarification. *Id.* Then, the court could engage in a more meaningful analysis of the decision.

It follows that the post-remand clarification required of the Board would not only give the courts a foundation for meaningful appellate review, but it would also allow the parties and the intervenor to know the reasons for the Board's ruling and, from that, the nature of the appellate issues that should be pursued. Thus, none of the parties – including Widewaters itself – can properly be deemed to have waived any argument that is generated by the Board's proper findings. As it turned out from the Law Court's decision and the findings subsequently issued by the Board, the parties and this court did not comprehensively categorize the Board's findings in the first appeal. Because the basis for the Board's 2001 decision was seen too narrowly during the first appeal, the arguments of the parties and the intervenor were also too narrow in scope in that first action. The basis for the Board's 2001 decision was not brought into plain view until the Board issued its findings in May 2002. Now with the benefit of the Board's comprehensive findings, the parties and the intervenor all are now in a position to engage in a full appellate analysis of the resulting decision, and they cannot be limited to something less than that.

### 3. Sufficiency of the evidence

As is noted above, a majority of the Board concluded in its 2002 findings that Widewaters' permit application failed to satisfy three of the eleven considerations found in section 165-114. Widewaters urges here that the evidence was insufficient to support

---

[7] This element of the Law Court's holding disposes of Widewaters' argument that the record clearly shows that the Board must have rested its decision to deny the application on the basis of section 165-114(I). If that were apparent from the record, there would be no need for the remand ordered by the Court.

that finding. Because Widewaters was the applicant, it now must demonstrate that the Board was compelled to reach a contrary result. *Veilleux v. City of Augusta*, 684 A.2d 413, 415 (Me. 1996). On this issue, the court examines the record and reviews the Board's findings "for an abuse of discretion, error of law, or findings unsupported by substantial evidence in the record." *Cumberland Farms, Inc. v. Town of Scarborough*, 1997 ME 11, ¶ 3, 688 A.2d 914, 915. "Substantial evidence is evidence that a reasonable mind would accept as sufficient to support a conclusion. . . .The possibility of drawing two inconsistent conclusions from the evidence does not make the evidence insubstantial." *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 8, 746 A.2d 368, 372 (citation omitted).

As articulated by the Board in its 2002 findings, one of the three factors underlying the decision to deny Widewaters' application is found in section 165-114(J), which requires the Board to "consider the following features and impacts before granting approval: . . . (J) Whenever situated, in whole or in part, within 250 feet of any pond, lake, river, stream or tidal waters, whether any project will not adversely affect the shoreline of such body or water." A majority of the Board concluded that Widewaters' plan did not satisfy this requirement.

Widewaters' development plan included the creation of a 5 feet deep detention pond. *See* R. H-1 at 6. The purpose of the detention pond is to catch water and other substances (both solid and liquid) that run off the impervious surfaces of the development, such as buildings, paved parking areas, roads and walkways. *Id.* An engineer involved in the development plans testified that the pond was intended to collect that runoff from the impervious area and then allow only water to be discharged into the stream. *Id.* at 7. The written plan submitted by Widewaters noted that the total impervious area covers more than 18 acres, or two-thirds, of the 28 acre parcel. *See* R. G-4. The location and configuration of the proposed detention pond is shown in several of the plans that make up exhibit G-9 of the record on this appeal. It was designed in a way "to fit into the topography" and to locate it as close as possible to the proposed buildings. *See* R. H-1 at 6. Although the buildings, parking areas and other aspects of the "development" would be located more than 250 feet from the stream, the architect for

the proposal advised the Board that "a good portion" of the detention pond is within 250 feet of the stream. *See* R. H-2 at 3.

One of the opponents who presented testimony at the Board's March 20, 2001, hearing was Richard Andren, who was a retired professor of biology and environmental studies. *See* R. H-1 at 23. He explained to the Board that he had reviewed Widewaters' submissions regarding runoff from the impervious areas. *Id.* Andren said that the Penjajawoc Stream has the capacity to tolerate runoff caused by existing development. The detention pond is designed to allow water that is collected in it to enter the stream slowly. *Id.* He projected, however, that with a rainstorm or snowmelt, because the runoff from the proposed development will be directed entirely into the detention pond and then eventually into the stream, "the character of the stream from that point on will be altered" because a greater volume of water will be directed into the stream, and that water would enter the stream more quickly than it does naturally (that is, without the creation of a large impervious surface). *Id.* at 24. This causes the soil in the stream to become unstable, thereby causing silt that "literally suffocates the stream's inhabitants." *Id.* That has a consequential effect on other animals in the food chain. *Id.* Additionally, because of the large impervious area associated with the proposed development, the water table in the area would be lowered. *Id.* During dry periods, there would be a reduction of water in the stream compared to its present state, and then during rainstorms, there would be a surge of water that would create erosion and change the course of the stream. *Id.*

Andren also stated that debris ultimately would be washed into the stream. *Id.* at 24. Other contaminants, such as oil or gas from the parking areas and nutrients from the garden center of the proposed store, would also enter the stream. *Id.* at 24, 25.

Another witness at the public hearing held by the Board was Chandler Morse, a University of Maine graduate student in ecology and environmental science who had conducted a study on the effects of urban development on streams in Maine. Morse found that major stream components, such as water quality, the physical integrity of the stream and waterlife, degrade when 6 percent of the watershed is rendered impervious. *See* H-1 at 27. Without the proposed development, 7 percent of the Penjajawoc watershed already was impervious. *Id.* at 28. From that, Morse stated that "any further

development inside that watershed is going to have significant issues with both the physical water quality and the benthic community [plants and animal living in or near water]." *Id.* Morse also explained that the detention pond is designed to accommodate a 25 year rainstorm. *Id.* However, that is an average assessment and is not an assurance that such significant storms would not occur more frequently. *Id.*

The majority of the Board expressly accepted and relied the testimony of Andren, Morse and several other witnesses. *See* R. I-6 at 6-7. Based largely on that evidence, a majority of the Board concluded that the development project would adversely affect the shoreline of the Penjajawoc Stream and that the application therefore did not satisfy the criterion set out in section 165-114(J) of the City's ordinance. More specifically, the majority concluded that, among other things, the development would result in an erosion of the streambed, in increased pollution in the stream water and a destruction of habitat. *Id.* Further, two members of the majority (Lingley and Kreitzer)"found that the outflow of the detention pond would have a negative impact on the stream at the project site." *Id.* at 7. Lingley and Costlow found that the water volume and quality would be affected downstream. *Id.* Consequently, each of the three majority members of the Board concluded that the proposed development would adversely affect the shoreline of the Penjajawoc Stream. Those three Board members agreed on least one of the bases for this finding. The record provides evidentiary support for this finding, as well as for the two plurality findings in which all three of the majority members participated.

Widewaters contends here that the findings made orally by some of these Board members at the conclusion of the April 3, 2001, hearing undermine the written findings issued in May 2002 and therefore demonstrate that there is insufficient evidence to support the latter. A full and fair review of those oral comments, however, reveals that the Board members who voted to deny Widewaters' permit application in 2001 expressed fundamental concern about the adequacy of the detention pond to protect the stream. Kreitzer made reference to Morse's testimony as well as "other evidence which speaks to the nature of the run-off and what happens with impervious services." *See* R. H-2 at 9. Lingley said, "clearly this buffer zone is very important to the ecology of the area and I'll tell the applicant that if the [detention] pond were outside of this 250 foot zone, I could support the application, but as it has been presented to us tonight, I couldn't and

10

therefore, I would have to vote against it on that single basis." *Id.* at 10. It is clear from Lingley's explanation that the basis for his vote was the proximity of the detention pond to the stream and the consequential impact on the stream's ecology. This concern falls squarely within the scope of section 165-114(J). Finally, Costlow agreed with Lingley's assessment that the location of the detention pond within 250 feet of the stream was an influential factor in his analysis. *Id.* at 12. Each of these remarks directly implicates the shoreline issues that were developed in the evidence presented to the Board. Therefore, even if the findings made by the Board at the conclusion of the 2001 administrative process may be used to impeach the written findings issued later, then those oral findings do not have that effect.

Finally, Widewaters argues that the Board's decision is undermined because it was based in part on consideration of the effects of the detention pond on the shoreline more than 250 feet away from the project site. "The interpretation of the provisions of a zoning ordinance is a question of law . . . ." *Kurlanski v. Portland Yacht Club*, 2001 ME 147, ¶ 9, 782 A.2d 783, 786. Language used in a municipal ordinance must be construed in a way that is reasonable, that takes into account its specific purpose and general structure, and that does not lead to "absurd, illogical or inconsistent results." *Id.* (internal punctuation omitted).

The plain terms of section 165-114(J) require the Board to consider the effects of a proposed development, "[w]henever situated, in whole or in part," on a shoreline if that project would be located within 250 of any stream or other body of water. The ordinance does not limit the Board and prevent it from considering the project's effect on that watercourse beyond the 250 foot perimeter. Such a restriction would be illogical and inconsistent with the stated purposes of the ordinance, which, among other things, is "to prevent and control water pollution; to protect fish spawning grounds, aquatic life and bird and other wildlife habitat; to protect buildings and lands from flooding and accelerated erosion;. . . to protect freshwater and coastal wetland; to conserve shore cover. . .; and to anticipate and respond to the impacts of development in shoreland areas." CITY OF BANGOR, MAINE LAND DEVELOPMENT CODE § 165-1(H). As Widewaters construes section 165-114(J), the Board would be authorized to consider the adverse shoreline impact caused by a development project up to 250 feet from the project site but

then turn a blind eye toward any effects that occur 251 away and beyond that geographical boundary. Here, however, the evidence on which the Board based its findings demonstrates that the riparian effects of development can be more far-reaching. As long as there exists a stream within 250 feet of the project site, section 165-114(J) requires the Board to examine any adverse consequence – even those that may occur to that part of the stream that is not within 250 feet of the site.

For these reasons, the administrative record supports the Board's finding that Widewaters' site development application did not satisfy the condition set out in section 165-114(J). This finding, taken alone, was a sufficient basis on which to deny the permit application. As is discussed below in the context of Widewaters' constitutional challenge to section 165-114, the court construes subsection (J) as creating a necessary (but not sufficient) condition to the issuance of a site development permit. The introductory paragraph to section 165-114 requires the Board to "consider the following features and impacts before granting approval. . . ." One of those "impacts" is identified in subsection (J). Subsection (J) obligates the Board to determine "whether any project *will not* adversely affect the shoreline" of a body of water located within 250 feet of the project (emphasis added). The formulation of subsection (J) is different than that of most of the other factors, which simply describe the subject that the Board must address. For example, the Board is also required to consider parking and loading areas (section 165-114(B)), storm water drainage (section 165-114(D)), outdoor lighting (section 165-114(E)) and other aspects of the proposed development. In contrast, when the Board examines the factor specified in section 165-114(J), it must find that the project "will not adversely affect" a shoreline.

Such a result is not an impossibility, as revealed by this record. Indeed, Widewaters presented evidence to the Board that the detention pond would allow "water and only water" to discharge. *See* R. H-1 at 7. Therefore, this construction of section 165-114(J) coheres with the conventional principles of construction of municipal ordinances and, in fact, flows from the evidentiary analysis offered by Widewaters.

Therefore, because the Board was entitled to conclude that Widewaters had not satisfied section 165-114(J) and because that failure of proof was fatal to the site development permit application, the court need not and therefore does not address the

12

parties' remaining contentions regarding the other two provisions (sections 165-114(D) and (I)) at issue here.

### 4. Constitutional challenge

Finally, Widewaters argues that the three provisions of the ordinance on which the Board based its decision are unconstitutional because they embody an illegally excessive delegation of authority to the Board. For the reasons noted above, the court addresses only this argument as it implicates section 165-114(J).

In its May 31, 2001, order, this court discussed the legal principles underlying the different roles between a legislative body, such as a city council, that enacts zoning ordinances and an administrative body, such as a planning board, that is charged with implementing those ordinances by applying them to specific permit applications. The court incorporates the May 2001 order and does not reiterate that discussion here. For purposes of this order, it is sufficient to note that in the end, a planning board may be given only the authority "to hear and decide whether the applicant has met those factual conditions" necessary to obtain a permit. *Wakelin v. Town of Yarmouth*, 523 A.2d 575, 577 (Me. 1987). Stated conversely, the administrative body cannot properly be given "discretion. . .as to whether or not to grant the permit if the conditions stated in the ordinance exist." *Stucki v. Plavin*, 291 A.2d 508, 511 (Me. 1972).

For the reasons noted above, the court construes section 165-114(J) to require an applicant to satisfy the Board, as a factual matter, that the proposed development project "will not adversely affect the shoreline of" a stream that is located within 250 of any part of the project. This construction is warranted not only for the reasons noted above, but, in the face of this constitutional challenge, for the additional reason that this construction, which is warranted by the language and purpose of the ordinance, also avoids even the argument that Widewaters advances here. *See Irish v. Gimbel*, 1997 ME 50, ¶ 6, 691 A.2d 664, 669. This comports with the principle that legislation should be construed in a way that does not render it unconstitutional.

Seen in this way, section 165-114(J) leaves no room for discretion. The Board is not entitled to exercise any judgment regarding policy, because the policy is established in that provision: development is not permitted if it would adversely affect such a shoreline. Further, the tight formulation of that provision forecloses the "selectivity" that

13

is one of the evils of an unconstitutional delegation, *see Town of Windham v. LaPointe*, 308 A.2d 286, 293 (Me. 1973). Finally, it provides the applicant with very specific notice of a requirement that it must satisfy in order to obtain a permit. *Wakelin*, 532 A.2d at 577. Because of the qualitatively different structures between subsections (I) and (J), the Board's obligation to "consider" both of them has very different consequences. Even if Widewaters is correct in its conclusion that the Board has discretion of legislative magnitude because it is merely required to "consider" some of the factors, that flexibility and discretion vanishes when the Board concludes under section 165-114(J) that a proposed development would have an adverse affect on the shoreline of a stream located within 250 feet of the development. Therefore, if the Board's obligation to "consider" other particular features and impacts is an impermissible delegation of policy-making authority, that flaw – if it is one, *see* Order dated May 31, 2001, at 13-14 --, does not affect section 165-114(J).

Therefore, the court concludes that section 165-114(J) does not unconstitutionally defer the policy prerogatives of a legislative body to the Planning Board. The court need not and does not address the remaining constitutional challenges raised here by Widewaters.


The entry shall be:

For the foregoing reasons, the decision of the Bangor Planning Board to deny Widewaters' application for a site development permit is affirmed.


Dated: March 25, 2003

_____
Justice, Maine Superior Court

14

Date Filed __6/20/02__ _____Penobscot_____ Docket No. ___AP-2002-12___
County

Action __Rule 80B Appeal__

**ASSIGNED TO JUSTICE JEFFREY L. HJELM**

BACORD (9/8/02)

WIDEWATERS STILLWATER CO. LLC     vs.     CITY OF BANGOR

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Stephen Langsdorf, Esq. <br> Virginia Davis, Esq. <br> Preti Flaherty Beliveau Pachios & Haley <br> P O Box 1058 <br> Augusta ME 04332-1058 | JOHN HAMER, ESQ <br> 73 HARLOW STREET <br> BANGOR, ME. 04401 <br><br> GROSS, MINSKY & MOGUL, P.A. <br> P O BOX 917 <br> BANGOR ME 04402-0917 <br> BY: EDWARD W. GOULD, ESQ. <br> FOR: BACORD |

| Date of Entry | |
|---|---|
| 6/20/02 | Complaint (Rule 80B) filed. |
| 6/20/02 | Notice and Briefing Schedule Rule 80B Appeal of Governmental Actions forwarded to attorney for the Appellant. |
| 6/25/02 | Entry of Appearance filed by John Hamer, Esq. for Defendant City of Bangor. |
| 6/25/02 | Notice and Briefing Schedule Rule 80B Appeal of Governmental Actions forwarded to attorney of the Defendant. |
| 6/25/02 | BACORD's Motion to Intervene filed by Gross, Minsky & Mogul, P.A. |
| 6/25/02 | Answer of Intervenor BACORD filed by Gross, Minsky & Mogul, P.A. |
| 7/9/02 | Defendant's Response to Bacord's Motion to Intervene filed. |
| 7/15/02 | Plaintiff's Objection to BACORD's Motion to Intervene filed. |
| 7/26/02 | File presented to Justice Hjelm for review. |
| 7/26/02 | Motion to Extend Time for Filing Brief and Record filed by Plaintiffs. |
| 7/29/02 | This matter is now before the Superior Court on the plaintiff's appeal from the City of Bangor Planning Board, following remand to the Board from the Law Court. Under the provisions of the Single Justice Assignment Program, this case has been re-assigned to me. Within 14 days of this order, counsel for the parties and the prospective intervenor shall advise the clerk in writing of whether any such party seeks recusal, does not seek or wishes to be heard further prior to formulating either position. If the clerk is advised of a position, that advice shall constitute a representation that counsel has fully conferred with the party or prospective intervenor regarding this order. Until this issue is resolved, I will take no further action in this matter. The entry shall be: Order issued on potential recusal issue. (Hjelm, J.) Copy forwarded to all attorneys of record. |